## LENG MAY MA *v.* BARBER, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE.

No. 105.   Argued May 20, 1958.—Decided June 16, 1958.

*Joseph S. Hertogs* argued the cause and filed a brief for petitioner.

*Leonard B. Sand* argued the cause for respondent.   On the brief were *Solicitor General Rankin, Assistant Attorney General Anderson, Beatrice Rosenberg* and *Julia P. Cooper.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a habeas corpus case involving § 243 (h) of the Immigration and Nationality Act, which authorizes the Attorney General "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecu-

tion. . . ." [1]  Claiming to be an alien "within the United States" by reason of her parole in this country while her admissibility was being determined, petitioner contends that she is eligible to receive the benefactions of § 243 (h). The Attorney General contends that the section is applicable only to aliens who, in contemplation of law, have entered the United States.  He argues that petitioner has never enjoyed that status because she eventually was found ineligible for entry and ordered excluded.  The District Court denied a writ of habeas corpus, and the Court of Appeals affirmed.  241 F. 2d 85.  We granted certiorari.  353 U. S. 981 (1957).  We conclude that petitioner's parole did not alter her status as an excluded alien or otherwise bring her "within the United States" in the meaning of § 243 (h).

Petitioner is a native of China who arrived in this country in May 1951 claiming United States citizenship on the ground that her father was a United States citizen. Pending determination of her claim, she at first was held in custody, but later, in August 1952, was released on parole.  Some three months thereafter, having failed to establish her claim of citizenship, she was ordered excluded, and the Board of Immigration Appeals affirmed. She surrendered for deportation in January 1954, and thereafter applied for a stay of deportation under § 243 (h) in which she alleged that her pending deportation to China would subject her to physical persecution and probable death at the hands of the existing government.  Her petition for writ of habeas corpus followed administrative notification of her ineligibility for relief under that section.  Petitioner does not challenge the

---

[1] Section 243 (h): "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."  66 Stat. 214, 8 U. S. C. § 1253 (h).

validity of her exclusion order or the proceedings culminating therein. She merely contends that by virtue of her physical presence as a parolee she is "within the United States," and hence covered by § 243 (h). The question, therefore, is wholly one of statutory construction.

It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry." *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 212 (1953). See *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 596 (1953). The distinction was carefully preserved in Title II of the Immigration and Nationality Act. Chapter 4 [2] subjects those seeking admission to "exclusion proceedings" to determine whether they "shall be allowed to enter or shall be excluded and deported." 66 Stat. 200, 8 U. S. C. § 1226 (a). On the other hand, Chapter 5 [3] concerns itself with aliens who have already entered the United States and are subject to "expulsion," as distinguished from "exclusion," if they fall within certain "general classes of deportable aliens." 66 Stat. 204, 8 U. S. C. § 1251. Proceedings for expulsion under Chapter 5 are commonly referred to as "deportation proceedings." Parenthetically, the word "deportation" appears also in Chapter 4 to refer to the return of excluded aliens from the country, but its use there reflects none of the technical gloss accompanying its use as a word of art in Chapter 5.

---

[2] 66 Stat. 195–204, 8 U. S. C. §§ 1221–1230.

[3] 66 Stat. 204–219, 8 U. S. C. §§ 1251–1260.

For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States. *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 215 (1953); *United States* v. *Ju Toy,* 198 U. S. 253, 263 (1905); *Ekiu* v. *United States,* 142 U. S. 651, 661 (1892). It seems quite clear that an alien so confined would not be "within the United States" for purposes of § 243 (h). This, in fact, was conceded by respondents in the companion case, *Rogers* v. *Quan, post,* p. 193. Our question is whether the granting of temporary parole somehow effects a change in the alien's legal status. In § 212 (d)(5) of the Act, generally a codification of the administrative practice pursuant to which petitioner was paroled,[4] the Congress specifically provided that parole "shall not be regarded as an admission of the alien," and that after the return to custody the alien's case "shall *continue* to be dealt with in the same manner as that of any other applicant for admission to the United States."[5] (Emphasis added.) Petitioner's concept of the effect of parole certainly finds no support in this statutory language.

---

[4] See Analysis of S. 716, 82d Cong., General Counsel, Immigration and Naturalization Service, pp. 39–42.

[5] Section 212 (d)(5): "The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 66 Stat. 188, 8 U. S. C. § 1182 (d)(5).

This Court previously has had occasion to define the legal status of excluded aliens on parole. In *Kaplan* v. *Tod,* 267 U. S. 228 (1925), an excluded alien was paroled to a private Immigrant Aid Society pending deportation. The questions posed were whether the alien was "dwelling in the United States" within the meaning of a naturalization statute, and whether she had "entered or [was] found in the United States" for purpose of limitations. Mr. Justice Holmes disposed of the problem by explicitly equating parole with detention:

> "The appellant could not lawfully have landed in the United States . . . , and until she legally landed 'could not have dwelt within the United States.' *Zartarian* v. *Billings,* 204 U. S. 170, 175. Moreover while she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared. *United States* v. *Ju Toy,* 198 U. S. 253, 263. When her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was still in theory of law at the boundary line and had gained no foothold in the United States." 267 U. S., at 230.

We find no evidence that the Congress, in enacting § 243 (h) in 1952, intended to depart from this interpretation.

The context in which § 243 (h) appears in the Act persuasively indicates the scope of its provisions. As we have observed, Title II of the Act preserves the distinction between exclusion proceedings and deportation (expulsion) proceedings, Chapter 4 dealing with the former and Chapter 5 with the latter. Within the two chapters are enumerated separate administrative procedures for

exclusion and expulsion, separate provisions for removal and transportation, and—most significantly—separate provisions for stays of deportation. Section 243 (h), under which petitioner claims relief, was inserted by the Congress *not* among Chapter 4's "Provisions Relating to Entry and Exclusion," but squarely within Chapter 5—a strikingly inappropriate place if, as petitioner claims, it was intended to apply to excluded aliens.

The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally "within the United States" is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court. Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. See Annual Reports, Immigration and Naturalization Service, 1955, pp. 5–6; 1956, pp. 5–6. Certainly this policy reflects the humane qualities of an enlightened civilization. The acceptance of petitioner's position in this case, however, with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy—an intention we are reluctant to impute to the Congress.

*Affirmed.*

Mr. Justice Douglas, with whom The Chief Justice, Mr. Justice Black and Mr. Justice Brennan concur, dissenting.

The statutory provision in controversy is contained in § 243 (h) of the Immigration and Nationality Act of 1952, 66 Stat. 212, 214, 8 U. S. C. § 1253 (h), which reads:

"The Attorney General is authorized to withhold deportation of any alien within the United States

to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."

The alien who is physically present in this country is about to be sent to Communist China—a country which the Immigration and Naturalization Service itself has told us is inhospitable to refugees.*

---

*The Immigration and Naturalization Service announced on October 31, 1956, a policy of granting stays of deportation for those headed back to Red China. In that connection it stated:

"Official notice may be taken that the China mainland is under the control of a de facto Communist government. As in other Communist states, this government operates as a totalitarian dictatorship, suppressing personal liberties and imposing arbitrary restraints on the people when necessary to maintain its authority or secure its objectives. Its methods for imposing its will include persecution of individuals and groups by way of economic sanctions, corporal punishment, incarceration, and execution.

"While it can be accepted as a general proposition that the Peiping government at times engages in these forms of persecution to further its authoritarian ends, no reliable information has yet been made available to this Service to indicate whether such persecution is directed indiscriminately against the populace as a whole or whether it is employed on a selective basis against particular elements. It is not known to what extent or to what degree such factors as personal political beliefs or religious views, in themselves, are noticed or acted upon by the Communist authorities. Another unknown factor is whether prior presence in the United States has any bearing on the kind of treatment accorded by the Communist authorities to a Chinese national upon his return to the mainland, despite the fact that there is evidence indicating strong and continued efforts on the part of these same authorities to persuade their overseas nationals to re-establish themselves and their residence within Communist China. These and other specific considerations bearing on the question of physical persecution as practiced on the China mainland today are matters which await further inquiry and to which an answer may be provided through the collation of intelligence material being gathered by other agencies of the United States government." *In re Lee Sung,* No. A–7921505.

The question for us is not whether she should or should not be returned to China. It is whether the Attorney General has discretion to withhold her deportation if in his opinion she would be "subject to physical persecution" were she returned to that country.

This alien is not in custody at our border. She is here on parole. The authority to parole is contained in § 212 (d)(5) of the Act—the Attorney General may "in his discretion" parole an alien "into the United States." How an alien can be paroled "into the United States" and yet not be "within the United States" remains a mystery.

Of course if we had the problem of *Kaplan* v. *Tod,* 267 U. S. 228, different considerations would come into play. There an alien on parole sought to have her years here used to gain herself citizenship. Alternatively, she argued that the statute had run on her deportation since her parole was an "entry."

No such enlargement of the prerogatives of a parolee is sought here. This alien seeks not citizenship, not residence, but only the shelter of a provision of the law designed to protect such refugees from the fate of "physical persecution." She only requests that she be eligible to be considered by the Attorney General as a beneficiary of this humane provision of our law. Only a hostile reading can deny her that respite.

I would not read the law narrowly to make it the duty of our officials to send this alien and the others in the companion case to what may be persecution or death. Technicalities need not enmesh us. The spirit of the law provides the true guide. It makes plain, I think, that this case is one of those where the Attorney General is authorized to save a human being from persecution in a Communist land.