Pedro RODRIGUEZ–FERNANDEZ,
Petitioner-Appellee,

v.

George C. WILKINSON, Warden,
Respondent-Appellant.

No. 81–1238.

United States Court of Appeals,
Tenth Circuit.

July 9, 1981.

William C. Bryson, Atty., Dept. of Justice, Washington, D. C. (James P. Buchele, U. S. Atty., Robert S. Streepy, Asst. U. S. Atty., Topeka, Kan., Jack M. Goldklang and Kate Stith Pressman, Attys., Washington, D. C., with him on the brief), for respondent-appellant.

Dennis D. Goodden, Kansas City, Mo. (Henri J. Watson and Tim Carmody, Kansas City, Mo., Roger L. McCollister, Executive Dir. and William E. Metcalf, Kansas Legal Services, Inc., Topeka, Kan., with him on the brief), for petitioner-appellee.

Jerome J. Shestack, Philadelphia, Pa. (Merrie Faye Witkin and Christopher Keith Hall, New York City, with him on the

brief), for amici curiae The Lawyers Committee for International Human Rights and the U. S. Helsinki Watch Committee.

Steven M. Schneebaum of Patton, Boggs & Blow, Washington, D. C. (Harry A. Inman and Amy Young-Anawaty, Washington, D. C., of counsel), filed a brief for amicus curiae the International Human Rights Law Group.

Howard Eisberg, Kansas City, Mo., filed a brief for amicus curiae American Civil Liberties Union, Western Missouri.

Before McWILLIAMS, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from a decision of the district court granting a writ of habeas corpus, ordering immediate release of Pedro Rodriguez-Fernandez to the custody of an American citizen upon such conditions as the Attorney General of the United States may impose. Rodriguez-Fernandez is a Cuban national who arrived in the United States aboard the so-called Freedom Flotilla which carried approximately 125,000 people from Cuba to Key West, Florida. Petitioner arrived at Key West on June 2, 1980, seeking admission to this country as a refugee.

Acting pursuant to 8 U.S.C. § 1223(a), immigration officials permitted Rodriguez-Fernandez to leave the boat and placed him in custody pending a determination of his eligibility for admission. In an interview with immigration officials, Rodriguez-Fernandez admitted that at the time he left Cuba he was a prisoner serving a sentence in a Cuban prison for attempted burglary and escape. He denied being guilty of the attempted burglary, for which he was tried by a military revolutionary court. But he confessed that he had prior convictions in 1959 and 1964, in each case for the theft of a suitcase from a bus or train station, and that while serving an eight year term for the second theft he escaped from prison.

In 1973, at the time of his conviction, he received a four year sentence for the attempted burglary and an added three year term for the escape. He testified he was scheduled for release from prison on June 27, 1981, apparently at the expiration of the terms imposed in 1973. Based upon his criminal record and lack of immigration documents, the officers found that Rodriguez-Fernandez was not clearly entitled to land. He was then detained pending an exclusion hearing pursuant to 8 U.S.C. §§ 1182(a)(9), (20), and 1225(b). Following a brief stay at a processing camp in Wisconsin, petitioner was transferred to the federal penitentiary at Leavenworth, Kansas.

In a formal exclusion hearing held July 21, 1980, an immigration hearing officer determined that Rodriguez-Fernandez was an excludable alien and ordered him deported to Cuba pursuant to 8 U.S.C. § 1227(a). Petitioner does not challenge the lawfulness of the exclusion order; that is not an issue in this appeal. The Immigration and Naturalization Service on August 28, 1980, requested the State Department to arrange petitioner's deportation to Cuba. Cuba, however, has refused all requests to accept petitioner and other members of the Freedom Flotilla. The trial court found,

> "Cuba has either not responded or responded negatively to six diplomatic notes transmitted by the United States. Thus, the Government has been unable to expeditiously carry out the order of deportation and cannot even speculate as to a date of departure. No other country has been contacted about possibly accepting petitioner."

*Fernandez v. Wilkinson,* 505 F.Supp. 787, 789 (D.Kan.1980). Upon Cuba's refusal to accept petitioner, the Attorney General ordered his continued detention in the federal penitentiary at Leavenworth. He was incarcerated there in September 1980, when he filed the instant petition for a writ of habeas corpus. Thereafter, he was transferred to the United States Penitentiary in Atlanta, Georgia, where he is currently held

with approximately 1,700 other excludable Cubans similarly situated.

By an order dated December 31, 1980, the district court held that Rodriguez-Fernandez has no rights to avoid detention under either the Fifth or Eighth Amendments to the United States Constitution. However, it held that the Attorney General's actions under the circumstances were arbitrary and an abuse of his discretion. It found that although the Attorney General's actions did not offend any statute, they violated principles of customary international law which create a right to be free from such detention. The order gave the government ninety days to release Rodriguez-Fernandez. The court later denied a government motion to reopen based upon the transfer of petitioner to Atlanta. On April 22, 1981, a compliance hearing was held with respect to its earlier order. The government reported that, exercising the discretionary parole power, representatives of the Attorney General determined Rodriguez-Fernandez to be releasable pursuant to 8 U.S.C. § 1182(d)(5).[1] He had not been released, however, because of a suspension imposed by the new national administration of President Reagan to permit a reconsideration of government policies. The court was informed that the President had appointed a special task force due to file a report May 4, 1981, discussing, *inter alia*, what should be done with the excluded Cubans still being detained. It requested an additional sixty days to effect either the deportation or parole of Rodriguez-Fernandez. On April 23, 1981, the district court denied the government's request and ordered petitioner's release within twenty-four hours to the sponsorship of an American citizen living in Kansas City. From these orders the government has appealed.

On the government's motion this Court entered a stay of the district court's order pending final disposition of the matter. The case was expedited and orally argued before a panel of this Court on May 12, 1981. The government attorneys promised to report to this Court any change in status or development affecting the incarceration of petitioner during our deliberations; they wanted additional time to develop a solution. The period we have needed for research and deliberation has given the government significant additional time. Apparently no change has been made, and we now must determine this controversy.

Rodriguez-Fernandez has committed no offense against the United States; he has merely appeared on our shores as a member of the Freedom Flotilla seeking permission to immigrate. Yet, he has been confined in a maximum security federal prison, some of the time in solitary confinement, for more than a year.

The case presents unusual difficulties. The applicable statutes are vague with regard to the problem facing this Court. Also, the case law generally recognizes almost absolute power in Congress concerning immigration matters, holding that aliens in petitioner's position cannot invoke the Constitution to avoid exclusion and that detention pending deportation is only a continuation of exclusion rather than "punishment" in the constitutional sense.

In the instant case the detention is imprisonment under conditions as severe as we apply to our worst criminals. It is prolonged; perhaps it is permanent. At least

---

1. In its brief, the government apprised this Court of the status of the Cuban refugees as of May 4, 1981. The government summarized Immigration and Naturalization Service status reports as follows: Approximately 1,700 of the original 125,000 some Cuban refugees who entered the country in the spring of 1980, including Rodriguez-Fernandez, are being detained in Atlanta as aliens convicted of crimes of moral turpitude. Almost 400 previously detained criminal aliens have been released on parole under the currently suspended review and release procedures. There are approximately 2,300 aliens housed in Fort Chaffee, Arkansas, none of whom have admitted committing crimes. An additional 200 aliens are confined in INS processing centers or in hospitals. The vast majority of the refugees have been released into the United States on parole under 8 U.S.C. § 1182(d)(5).

six times Cuba has been approached to take back petitioner and others in his status; Cuba has consistently refused or failed to acknowledge the request. The last attempt to effect a return was apparently in August 1980, many months ago. Thus it appears detention is here used as an alternative to exclusion rather than a step in the process of returning petitioner to his native Cuba. Petitioner testified he is willing to go to another country, "anywhere in the world where I'll not be a prisoner unjustly or unfairly." Under the statute, however, he may not specify a place of deportation; it states that he is to be deported to the country from whence he came. 8 U.S.C. § 1227(a).

We dispose of the appeal by construing the applicable statutes to require Rodriguez-Fernandez' release at this time. Nevertheless, it seems important to discuss the serious constitutional questions involved if the statute were construed differently.

■ It is clear Rodriguez-Fernandez can invoke no constitutional protection against his exclusion from the United States. He may be excluded for considerations of race, politics, activities, or associations that would be constitutionally prohibited if he were a citizen. *See Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904); *The Chinese Exclusion Case*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). He would fare no better if he were an alien resident in the United States. *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1950); *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); J. Wasserman, Immigration Law and Practice at 210–211 (3d ed. 1979); Note, The Alien and the Constitution, 20 U.Chi.L.Rev. 547, 549–550 (1953).[2]

2. There may be differences between resident aliens and those seeking entry as to their constitutional rights to a due process hearing concerning the reasons for the exclusion or deportation. *Compare United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950) *with Kwong Hai Chew v.*

■ Under the theory that Congress' power in this area is plenary and that, in any case, a deportation is not penal in nature, it has been held that normal criminal rights are inapplicable. Thus, aliens may be arrested by administrative warrant issued without the order of a magistrate, *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), and may thereafter be held without bail. *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952). Nevertheless, if an alien in Rodriguez-Fernandez' position should be accused of committing a crime against the laws of this country, he would be entitled to the constitutional protections of the Fifth and Fourteenth Amendments. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), stated,

"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any difference of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

118 U.S. at 369, 6 S.Ct. at 1070. In *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the Court extended this concept.

"Applying this reasoning to the 5th and 6th Amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to

*Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953). But the right to a hearing on the basis for exclusion is not an issue here. Petitioner was given such a hearing and does not challenge the order that he be returned to Cuba.

answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."

163 U.S. at 238, 16 S.Ct. at 981. The Court there struck down as unconstitutional a statute allowing administrative officials to arrest and imprison for up to one year Chinese found to be illegally within the country. The opinion quoted with apparent approval language from *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), which declared orders of deportation are not punishment for crime, but distinguished "those provisions of the statute which contemplate only the exclusion or expulsion of Chinese persons and those which provide for their imprisonment at hard labor, pending which their deportation is suspended." 163 U.S. at 236, 16 S.Ct. at 980.

■ Thus, it would appear that an excluded alien in physical custody within the United States may not be "punished" without being accorded the substantive and procedural due process guarantees of the Fifth Amendment.[3] Surely Congress could not order the killing of Rodriguez-Fernandez and others in his status on the ground that Cuba would not take them back and this country does not want them. Even petitioner's property cannot be taken without just compensation, absent the existence of a state of war between the United States and his country. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931). Certainly imprisonment in a federal prison of one who has been neither charged nor convicted of a criminal offense is a deprivation of liberty in violation of the Fifth Amendment, except for the fiction applied to these cases that deten-

tion is only a continuation of the exclusion. This euphemistic fiction was created to accommodate the necessary detention of excludable and deportable aliens while their cases are considered and arrangements for expulsion are made. *See Carlson v. Landon*, 342 U.S. 524, 538, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952).[4] Detention pending deportation seems properly analogized to incarceration pending trial or other disposition of a criminal charge, and is, thus, justifiable only as a necessary, temporary measure. Obviously detention pending trial assumes a different status if there is to be no trial. If, in this case, administrative officials ordered penitentiary confinement for life or a definite term because Cuba would not accept petitioner, it seems certain the courts would apply *Wong Wing* and hold that such imprisonment is impermissible punishment rather than detention *pending* deportation. Logic compels the same result when imprisonment is for an indefinite period, continued beyond reasonable efforts to expel the alien.

■ Federal circuit and district courts have long held deportable aliens in custody more than a few months must be released because such detention has become imprisonment. *See Petition of Brooks*, 5 F.2d 238, 239 (D.Mass.1925), which declared,

"The right to arrest and hold or imprison an alien is nothing but a necessary incident of the right to exclude or deport. There is no power in this court or in any other tribunal in this country to hold indefinitely any sane citizen or alien in imprisonment, except as a punishment for crime. Slavery was abolished by the Thirteenth Amendment. It is elementary that deportation or exclusion proceedings are not punishment for crime.... He is entitled to be deported, or to have his

---

**3.** We agree with *United States v. Henry*, 604 F.2d 908 (5th Cir. 1979), that no distinction can be drawn in application of these rules between an alien, like Rodriguez-Fernandez, who is regarded as standing at the border and one who is a resident in the United States. *See also United States v. Casimiro-Benitez*, 533 F.2d

1121 (9th Cir.), *cert. denied*, 429 U.S. 926, 97 S.Ct. 329, 50 L.Ed.2d 295 (1976).

**4.** The Court pointed out, however, that this case did not involve unusual delay in deportation. 342 U.S. at 546, 72 S.Ct. at 537.

freedom. He has already been imprisoned, for no crime, about nine weeks, for which he is apparently without remedy." In *United States ex rel. Ross v. Wallis*, 279 F. 401, 403–404 (2d Cir. 1922), the court said,

"We now take cognizance of the fact that peace has been declared, and regular communication with the British Isles reestablished, and we therefore express our opinion that unless this relator, or any other person similarly situated, be actually deported within four months after such alien has exhausted his legal remedies, any further or other detention under pretense of awaiting opportunity for deportation would amount, and will amount, to an unlawful imprisonment, from which relief may be afforded by a new habeas corpus."

See also *Wolck v. Weedin*, 58 F.2d 928, 930–931 (9th Cir. 1932); *Caranica v. Nagle*, 28 F.2d 955, 957 (9th Cir.), *cert. denied*, 277 U.S. 589, 48 S.Ct. 437, 72 L.Ed. 1002 (1928); *United States ex rel. Janavaris v. Nicolls*, 47 F.Supp. 201 (D.Mass.1942).

The linchpin of the government's case is *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). There an alien was confined to Ellis Island for twenty-one months before his case was decided by the Supreme Court. The Court refused to require his release within the United States. It may be, as Judge McWilliams states in his dissent, that a fair reading of that case supports the view that no constitutional infirmity exists in the continuing incarceration of Rodriguez-Fernandez, who has been in custody only a year. Nevertheless, differences exist between that case and this one which we think are significant. First, the primary focus of *Mezei* was upon the excluded alien's right to a due process hearing concerning his right of reentry into this country. Also, he was excluded as a security risk and the Korean War was in progress; security risks and enemy aliens during wartime have always been treated specially.

The conditions of Mezei's confinement on Ellis Island do not appear to be comparable to Rodriguez-Fernandez' imprisonment in two maximum security prisons. In *Mezei* there were continuing efforts to deport. Twice the alien was shipped out to other countries which refused to permit him to land; he applied for entry to other countries and thereafter voluntarily terminated his efforts to find a new home. His petition for relief sought not only release from confinement but also admission to the United States.

■ Even with these special facts *Mezei* has been criticized as the nadir of the law with which the opinion dealt. *See* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv.L.Rev. 1362, 1387–1396 (1953). In more recent cases, the Supreme Court has expanded the constitutional protections owed aliens apart from the right to enter or stay in this country. *See e. g.*, *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Due process is not a static concept, it undergoes evolutionary change to take into account accepted current notions of fairness. Finally, we note that in upholding the plenary power of Congress over exclusion and deportation of aliens, the Supreme Court has sought support in international law principles. *E. g.*, *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). It seems proper then to consider international law principles for notions of fairness as to propriety of holding aliens in detention. No principle of international law is more fundamental than the concept that human beings should be free from arbitrary imprisonment. *See* Universal Declaration of Human Rights, Arts. 3 and 9, U.N.Doc. A/801 (1948); The American Convention on Human Rights, Part I, ch. II, Art. 7, 77 Dept. of State Bull. 28 (July 4, 1977). For these several reasons, we believe *Mezei* does not compel the conclusion that no constitutional

problems inhere in petitioner's detention status.

When it passed the Internal Security Act of 1950 and its successor, the Immigration and Naturalization Act of 1952, 8 U.S.C. § 1101 *et seq.*, Congress was painfully aware of more than 3,000 warrants of deportation made unenforceable by the refusals of the countries of origin to grant passports for these persons' return. *See e. g.,* H.R.Rep.No.1192, 81st Cong., 1st Sess. 7–10 (1949). Most were nationals of iron-curtain countries and aliens residing in the United States. Despite these facts, or perhaps because of them, the Act provides for detention no longer than six months in deportation cases. 8 U.S.C. § 1252(c).[5] Further detention is permitted only after conviction for violation of restrictions imposed upon release on parole, *id.* § 1252(d), or after conviction for willfully refusing to depart or to cooperate in securing departure. *Id.* § 1252(e).

Provisions relating to excludable aliens seeking entry are not as specific. They provide for "temporary removal" from the transportation vehicle or vessel to a place of "detention, pending a decision on the aliens' eligibility to enter the United States and until they are either allowed to land or returned to the care of the transportation line or to the vessel or aircraft which brought them." 8 U.S.C. § 1223(b). *See also id.* §§ 1223(a) and (c), 1225(b), and 1227(a). Temporary parole into the United States is permitted in the discretion of the Attorney General, but is not to be regarded as admission of the alien into the country. 8 U.S.C. § 1182(d)(5).

■ Are we to read these provisions to permit indefinite detention as an alternative to exclusion, in view of the fact that Congress imposed a specific time limitation on holding resident aliens but none as to those "standing at the border"? We do not. There is no evidence to suggest that prior to the instant case a significant number of excludable aliens have been physically detained for periods of long duration. Justice Tom Clark, who was Attorney General during the formation of the presently effective immigration laws, stated in *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958), "[p]hysical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond."

Neither will we read into the statute a specific time limit for detention. Rather, since the statute contemplates temporary detention, we hold that detention is permissible during proceedings to determine eligibility to enter and, thereafter, during a reasonable period of negotiations for their return to the country of origin or to the transporter that brought them here. After such a time, upon application of the incarcerated alien willing to risk the possible alternatives to continued detention, the

---

5. 8 U.S.C. § 1252(c), in pertinent part, reads as follows:

"(c) When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States, during which period, at the Attorney General's discretion, the alien may be detained, released on bond in an amount and containing such conditions as the Attorney General may prescribe, or released on such other condition as the Attorney General may prescribe. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period. If deportation has not been practicable, advisable, or possible, or departure of the alien from the United States under the order of deportation has not been effected, within such six-month period, the alien shall become subject to such further supervision and detention pending eventual deportation as is authorized in this section."

alien would be entitled to release. This construction is consistent with accepted international law principles that individuals are entitled to be free of arbitrary imprisonment. It is also consistent with the statutory treatment of deportable resident aliens and with the constitutional principles outlined above.

■ We do not construe the Act to require release within the United States. The statute appears to contemplate that parole is to be in the absolute discretion of the Attorney General, at least as to aliens in Rodriguez-Fernandez' position, convicted of crimes involving moral turpitude. *See* 8 U.S.C. § 1182(d)(6). Parole within the country is one option available to the government, and we note that, under procedures approved by the predecessor to the present Attorney General, this petitioner was found to be qualified for such parole. But other options exist. He can be returned to the transportation vessel which brought him to the American shore, if it exists. *Id.* § 1223. We would not read 8 U.S.C. § 1227 to preclude his being sent to a country other than Cuba, if Cuba will not take him.

■ When an excludable alien in custody tests the detention by writ of habeas corpus pursuant to 8 U.S.C. § 1105a(a)(9) or 28 U.S.C. § 2241, we hold that the burden is upon the government to show that the detention is still temporary pending expulsion, and not simply incarceration as an alternative to departure. Information on this issue is more readily available to the government. On the record before us, it appears there are no current negotiations with Cuba or any other country to take petitioner and there is no reason for his continued incarceration other than the fact that no country has agreed to take him. That is insufficient reason to hold him further.

Since our interpretation of the applicable law and the relief ordered differs somewhat from that of the district court, we give the government thirty days in which to effectuate his release in a manner consistent with this opinion. It is so ordered.

McWILLIAMS, Circuit Judge, dissenting:

I respectfully dissent and would reverse the judgment of the trial court which orders the immediate release of Rodriguez-Fernandez, subject to certain conditions.

Like the majority of the panel, I agree that the present controversy should be resolved on the basis of domestic law, as opposed to international law, which was the basis for the trial court's release order.[1] Unlike the majority, however, I do not agree that domestic law supports the release order entered by the trial court. On the contrary, domestic law, in my view, requires a reversal of the trial court's release order.

Rodriguez-Fernandez has been determined to be an excludable alien because of prior convictions for crimes involving moral turpitude. 8 U.S.C. § 1182(a)(9) (1976, Supp. I 1977, Supp. III 1979). There has not been any challenge to such determination. Under applicable domestic law, an excludable alien *may be* detained pending deportation or he *may be* released on parole pending deportation. 8 U.S.C. § 1225(b) (1976) and 8 U.S.C. § 1182(d)(5). The determination as to whether a particular excludable alien is to be detained or released on parole, pending deportation, rests within the sound discretion of the Attorney General. 8 U.S.C. § 1182(d)(5). In the instant case, the Attorney General in the exercise of that discretion declined to release Rodriguez-Fernandez on parole and ordered him detained in a maximum security penal institution. Under the circumstances, I find no

---

1. It has been held that the customs and usages of civilized nations may be used to resolve controversies when there is no treaty, and *no* controlling executive or legislative act or judi-

cial decision. *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).

abuse of discretion on the part of the Attorney General. Rodriguez-Fernandez has a long record of criminality. In fact, he was in prison serving a sentence at the very time he was allowed by Cuban authorities to go to Florida. Certainly Rodriguez-Fernandez had no *right* to be released on parole pending deportation, and, as indicated, I find no abuse of discretion by the Attorney General in refusing to release him.

The majority is apparently disturbed about the location and duration of Rodriguez-Fernandez' detention. If Rodriguez-Fernandez had remained in Cuba, he, by his own admission, would still be in prison, at least he would have been as of the time he was before the trial court. Such being the case, it does not shock my conscience that he is being detained, awaiting deportation, in a facility within a maximum security institution. In any event, the applicable statute does not specify the place where excludable aliens should be detained, nor does the statute prohibit detention in the facility where Rodriguez-Fernandez is, and has been, held. Similarly, the fact that Rodriguez-Fernandez had been detained for some eight to nine months when the trial court ordered his release is of no particular significance. *See Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) where detention of an excludable alien for twenty-one months was upheld.[2]

The flaw in the majority opinion, as I see it, is that it attempts to deal with the fate of all 125,000 Cuban refugees in this one case. We are here concerned with one individual, Rodriguez-Fernandez. Perhaps my rule, if it were the rule of the majority, would apply to others similarly situated to Rodriguez-Fernandez, but it would of course not apply to others who are dissimilarly situated. For example, the indefinite detention in a maximum security institution of a true Cuban political refugee with no history of criminality, who is nonetheless determined to be an excludable alien, would in my view, constitute an abuse of discretion by the Attorney General.

The whole controversy narrows down to whether the Attorney General abused his discretion in refusing to release Rodriguez-Fernandez on parole, and in ordering his continued detention. I find no abuse of discretion. If Rodriguez-Fernandez had been serving a life sentence for murder in Cuba at the time he got out of Cuba and came to Florida, I cannot believe that there would be any hue and cry over the fact that Rodriguez-Fernandez was detained in a federal penitentiary, and not released on parole. Although Rodriguez-Fernandez was *not* serving a life sentence for murder at the time he was allowed to come to the United States, he was then serving a sentence upon his third conviction for a crime involving moral turpitude.

There is a suggestion that subsequent events somehow justify the action previously taken by the trial court. In this regard, for example, it is said that by now Rodriguez-Fernandez would be eligible for release from prison had he remained in Cuba. In my view, subsequent events may justify subsequent habeas corpus actions, but they do not warrant an expansion of the present

---

**2.** The majority distinguishes *Mezei* on the grounds that the primary focus therein was on the excluded alien's right to a due process hearing concerning his right to reenter the country. Although such may be the primary focus of *Mezei*, the Court therein clearly approved the detention of an excludable alien for twenty-one months. Additionally, the majority notes that Mezei was determined to be a security risk during the Korean War and that Mezei's confinement on Ellis Island does not appear to have been comparable to Rodriguez-Fernandez'

confinement in the instant case. Under the statute, the conviction of a crime of a moral turpitude parallels the determination that an alien is a national security risk as a ground for exclusion. 8 U.S.C. § 1182(a)(9) and (27). Moreover, there was no suggestion in *Mezei* that the excludable alien had a criminal record which would justify his detention in a maximum security institution. Rodriguez-Fernandez, on the other hand, has a significant criminal background.

proceedings. The present record should not be expanded on a day-to-day basis clear up to the time of our opinion. We are reviewing the judgment of the trial court which was made on the basis of the record then before it. That record does not justify the action taken by the trial court, nor the action now dictated by the majority opinion.

I would reverse.