Manuel DIAZ, Rodeno Roderiguez, Lucero Hidalgo, Emilio Cabreba, and Lorenzo Escobar, by their next friend, Kathryn Collard, Plaintiffs,

v.

Alexander M. HAIG, Jr., in his capacity as Secretary of State of the United States; William French Smith, in his capacity as Attorney General for the United States; Doris Meisner, in her capacity as Director of the Immigration and Naturalization Service; Robert Godshall, in his capacity as District Director of the Immigration and Naturalization Service; Norman Schoss, in his capacity as Supervisory Deportation Officer of the Immigration and Naturalization Service; Joe Earnhart, in his capacity as Acting Officer in Charge/Director of Investigation and Deportation of the Immigration and Naturalization Service; Gerald Fossbender, in his capacity as Officer in Charge of Immigration (Utah and Wyoming) of the Immigration and Naturalization Service; D.B. Hladky, in his capacity as Sheriff of the Campbell County Jail, Gillette, Wyoming; and Paul Redden, in his capacity as Sheriff of the Johnson County Jail, Buffalo, Wyoming, Defendants.

No. C81–235B.

United States District Court,
D. Wyoming.

Aug. 17, 1981.

Donald J. Sullivan, Cheyenne, Wyo., Kathryn Collard, Salt Lake City, Utah, Carol Hewett, National Juvenile Law Center, St. Louis, Mo., for plaintiffs.

Richard A. Stacy, U.S. Atty., D. Wyo., Peter Mulvaney, Deputy Asst. Atty. Gen., and Allen C. Johnson, Asst. Atty. Gen., Cheyenne, Wyo., for defendants.

## ORDER

BRIMMER, Chief Judge.

The above-entitled matter, having come on for hearing before the Court on August 22 and 24, 1981; the Plaintiffs appearing by and through their attorneys Carol Hewett, and Donald J. Sullivan, Esq., and the Defendants appearing by and through their attorneys Richard A. Stacy, Esq., United States Attorney, Peter J. Mulvaney, Deputy Attorney General for the State of Wyoming, and Greg Goddard, Esq.; the Court, having reviewed the pleadings, stipulations, briefs, and exhibits filed herein, having heard the testimony of witnesses and the arguments of counsel, having taken the matters under advisement, and now, being fully advised in the premises; FINDS, AS TO

JURISDICTION:

■ Controversies involving the custody and detention of aliens by officials of the Immigration and Naturalization Service (INS) are reviewable by Federal District Courts through application for a writ of habeas corpus under 8 U.S.C. § 1329, 28 U.S.C. § 1331, and 28 U.S.C. § 2241. Such was the well reasoned finding in *Genaro Soroa-Gonzales v. Civiletti*, 515 F.Supp. 1049 (D.Ga.1981). The fact that habeas corpus is sought for review of a matter ancillary or preliminary to a final determi-nation by the INS of exclusion or deportation does not deprive the Court of subject matter jurisdiction. *See Daneshvar v. Chauvin*, 644 F.2d 1248 (8th Cir.1981).

■ The presence of the parties detained or their custodian within the territorial confines of the Federal District Court's jurisdiction is sufficient to grant a writ of habeas corpus in accord with the limitations of 28 U.S.C. § 2241. *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973). Said custodian need not be the warden of the particular facility in which the habeas corpus petitioner is detained and jurisdiction is properly asserted where the party responsible for the petitioner's detention is available. *McCoy v. United States Board of Parole*, 537 F.2d 962 (8th Cir.1976); and *Lee v. United States*, 501 F.2d 494 (8th Cir.1974). Jurisdiction based on the presence only of the custodian of the petitioner is properly maintained where the district court entertaining the petition is the more convenient forum or there is a justifiable reason why the government should undertake the burden of transporting the petitioner to that court. *See Braden*, supra, 410 U.S. at 500, 93 S.Ct. at 1132. In the case at hand, at all relevant times during the litigation either the INS or all five of the petitioners were present within the State of Wyoming. Jurisdiction for habeas corpus purposes was therefore properly asserted.

## FINDS, AS TO THE CIRCUMSTANCES SURROUNDING THE DETENTION OF THE PETITIONERS:

All five of the petitioners are Cuban citizens between the ages of seventeen and eighteen. Each arrived at the shores of Key West or Miami, Florida between the months of April and July of 1980 as part of the "Freedom Flotilla" from Cuba. They have all been in custody since their arrival in the United States, with the exception of the weekend furloughs they were granted from Emerson House, a detention facility in Denver, Colorado. Each has been moved to and from federal prisons, refugee

**4**

processing camps, a half-way house, and county jails throughout the period they have been here without explanation.

■ Ira Schwartz, an administrator in the Office of Juvenile Justice and Delinquency Prevention until February of 1981, testified that the detention of juveniles in the manner in which the petitioners were confined is contrary to the federal policy set forth by his agency pursuant to the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. 5601 *et seq.* Thus, this Court finds the treatment of the petitioners since their arrival in the United States unduly harsh and their detention in facilities not suited to juvenile custody or rehabilitation an abuse of discretion by the Defendants. Their status as aliens subject to exclusion under the Immigration and Naturalization Act, 8 U.S.C. 1101 *et seq.,* does not warrant the deprivation of the protections and benefits offered to other juveniles in the United States.

## FINDS, AS TO THE STATUS OF THE PETITIONERS AS ALIENS SUBJECT TO EXCLUSION:

■ The Defendants claim that the detention of the petitioners over the past fourteen to sixteen months is justified by the statements they made to INS officials with regard to their criminal conduct in Cuba at the time they were first taken into custody upon their arrival. The circumstances under which the statements were taken, the doubts raised as to the proper transcription and translation of the statements of the petitioners, and the fact that they were made in the hope of obtaining freedom by cooperation in a coercive setting all lead this Court to question their reliability for purposes of determining the nature and seriousness of the crimes allegedly committed by the petitioners in Cuba. Absent the testimony of the parties who took the statements verifying their accuracy and that they were taken under proper conditions, they cannot be received as admissions against interest to show the truth of the matter contained therein.

■ There is also some doubt as to whether the wrongful acts alleged by the Defendants amount to the commission of crimes of moral turpitude within the meaning of 8 U.S.C. 1182(a)(9). At worst they consist of the theft of three sheep from a government farm by Manuel Diaz-Bandera in order to feed his family or the three separate thefts of food and clothing by Emilio Cabrera-Vazquez. Lazaro Hidalgo-Rodriguez was detained in Cuba merely for witnessing the theft of a wallet. Lorenzo Escobar-Sulueta was accused by his uncle of stealing rice, perfume, and six pesos from an abandoned house but was never brought to trial.

A court may examine the age of the offender, the circumstances surrounding the offenses, and the "modern viewpoint of the community with regard to offenses committed by a juvenile" in determining whether a crime of moral turpitude has been committed. *Tutrone v. Shaughnessy,* 160 F.Supp. 433 (D.C.N.Y., 1958). *See also Morasch v. Immigration and Naturalization Service,* 363 F.2d 30 (9th Cir.1966). In this respect, it is significant to note that, according to the testimony of the petitioners, they were dealt with as juveniles in the Cuban judicial system and were confined in separate juvenile camps or cells while serving sentences or awaiting trial in Cuba. All of this supports a finding that the theft of food by a hungry child or the theft of garments by an ill-clothed child do not constitute crimes of "moral turpitude" and are better classified as actions of self-preservation in a country where many of the necessities of life are withheld from a large portion of the populace.

## FINDS AS TO THE ACTION TAKEN BY THE INS AND THE ATTORNEY GENERAL TOWARDS THE PETITIONERS:

As stated above, the petitioners in this case have been under almost continuous detention since their arrival in the United States. In March of 1981, petitioners participated, with representation of counsel, in exclusion hearings conducted pursuant to 8

C.F.R. 236.7 to determine their status as excludable aliens under 8 U.S.C. § 1182. At present, no ruling has been rendered by the administrative law judge in their cases and all proceedings have been suspended pending the processing of asylum applications submitted by the petitioners to the Department of State. Defendants' witness Norman Schoss, Supervisory Deportation Officer of the INS, testified that it generally takes about nineteen months to process asylum applications. This raises the possibility that the petitioners could face another fourteen months in jail before their cases are finally decided at the administrative level. Furthermore, the scope of the administrative hearings is limited to the determination of excludability of the petitioners and the necessity of deportation. Yet, it is clear that deportation would be impossible in light of the failure of past efforts of the United States to make the necessary arrangements with the government of Cuba and the miniscule chance that such negotiations are likely to be successful in the future. *See Rodriguez-Fernandez v. Wilkinson*, 505 F.Supp. 787, 789 (D.Kan.1980), aff'd, 654 F.2d 1382 (10th Cir.1981).

The fact that the Attorney General has developed a plan to deal with the Cuban refugees still in custody at this time in an expeditious manner is commendable but insufficient as far as these petitioners are concerned. It took too long to formulate and, if the past is any indication, such proceedings are likely to result only in further confinement of these juveniles under conditions that this Court has already found unsuitable while their cases are being decided. Nor is there any indication that a hearing conducted under the auspices of such a plan would be more thorough or fruitful than that held before this Court.

Therefore, by virtue of the fact that the processing of these petitioners has been delayed for so long, thus requiring their detention under the unsuitable conditions described above, and in light of the likelihood of further unlawful detention, a writ of habeas corpus may be properly issued from this Court based on the following grounds:

1) Confinement of juvenile aliens who are subject to exclusion proceedings beyond a reasonable period of time or for an improper purpose constitutes an abuse of the Defendants' discretion under the Immigration and Naturalization Act, 8 U.S.C. 1101 *et seq*.

a) Detention Beyond a Reasonable Period.

Section 1223(a) of the Immigration and Naturalization Act provides for the "temporary removal" of aliens arriving at a port of the United States for purposes of examination and inspection. Section 1225(b) of the same act allows for the detention by an examining officer of any alien who does not appear to be "clearly and still beyond a doubt entitled to land". Aliens within this category may be held until "further inquiry" is conducted by a special inquiry officer. It is under these provisions and the regulations promulgated thereunder that the petitioners have been confined for the past fourteen to sixteen months.

Although no specific time limit is set by which the hearing must be held, these two provisions clearly contemplate temporary detention until the status of an alien can be determined for purposes of admission or exclusion. Three factors indicate that detention beyond a temporary period of time under these statutes is an abuse of discretion on the part of the Defendants. The first is 8 U.S.C. 1252(c), which sets the maximum length of time at six months for detention of an alien subject to deportation. Although the petitioners in this case are awaiting an exclusion hearing and not deportation, it is doubtful that Congress could have contemplated that aliens in their situation could be detained for a period longer than the six month maximum allowed for deportation, much less the confinement for more than a year that the petitioners presently before the Court have suffered.

The second factor is the conclusion reached by the United States Tenth Circuit Court of Appeals upon consideration of the

same statutes in the context of an alien already found excludable in *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981).

> (S)ince the statute contemplates temporary detention, we hold that detention is permissible during a reasonable period of negotiations for their return to the country of origin or to the transporter that brought them here... This construction is consistent with accepted international law principles that individuals are entitled to be free of arbitrary imprisonment. It is also consistent with the statutory treatment of deportable resident aliens and with the (applicable) constitutional principles.... 654 F.2d at 1389–1390

Finally, it is worth mentioning that, under 8 C.F.R. 212.5(b), where an excludable alien has been taken into custody after revocation of temporary parole and the exclusion order cannot be executed by deportation within a "reasonable time," an alien is once again entitled to parole "unless in the opinion of the district director the public interest required that the alien be continued in custody." There is no apparent reason why aliens confined pending the outcome of an exclusion hearing under circumstances in which deportation is far from likely should be treated more harshly than an alien who has already been deemed excludable yet not deportable. A reasonable length of detention is authorized in both cases. Here, the period thus designated for the Defendants to act has clearly passed and the equitable and remedial powers of this Court have thereby been invoked.

b) Detention for an Improper Purpose.

The question is also raised as to whether the detention of the petitioners in this case can be considered an abuse of discretion in light of the incongruencies between the ostensible purposes for detention set forth in 8 U.S.C. 1225(b) and what amounts to a substitution by the INS of incarceration for the appropriate exclusion hearings when parole would be an authorized and preferable alternative. To use such detention as an alternative to exclusion was declared unlawful in *Rodriguez-Fernandez*, supra, despite the fact that Congress imposed no definite limitation on the amount of time excludable aliens may be held. The same reasoning would appear to apply to aliens awaiting an exclusion hearing where deportation is not feasible.

Section 1182(d)(5) of the Immigration and Naturalization Act gives the Attorney General discretion to temporarily parole any alien applying for admission. This authority is delegated to the district director through 8 C.F.R. 212.5. Concerning the availability of parole, it was stated in *Leng May Ma v. Barber*, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958), that:

> The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.... Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. 357 U.S. at 185 [78 S.Ct. at 1072], citing to the Annual Reports, Immigration and Naturalization Service, 1955.

There has been no showing that the petitioners in this case are security risks or are likely to abscond. To the contrary, the testimony of the only persons who have had the opportunity to observe them outside of detention, their weekend sponsors, indicates that it would be in the best interest of all concerned for them to be released. Failure to do so under these circumstances is an abuse of discretion.

2) Having failed to act with regard to the petitioners during the extended period that they have been in confinement in the United States, the Defendants are estopped from asserting their exclusive jurisdiction over them.

The general immunity from the application of the doctrine of equitable estoppel enjoyed by the INS has been removed in the past under limited circumstances. Thus, where it can be shown that an excludable alien has been admitted into the United States as a result of affirmative

misconduct on the part of the INS, the doctrine may be used to preclude the government from denying entry to the detriment of the alien. *See United States Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *DeHernandez v. Immigration and Naturalization Service*, 498 F.2d 919 (9th Cir., 1974); and *Santiago v. Immigration and Naturalization Service*, 526 F.2d 488 (9th Cir., 1975), cert. den. 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Such was the case in *Corniel-Rodriguez v. Immigration and Naturalization Service*, 532 F.2d 301 (2d Cir., 1976), where an alien entitled to special entry status had not been warned of the circumstances in which her visa could be revoked, contrary to a State Department regulation. Upon balancing the equities of the case in light of the affirmative misconduct of the agency resulting from the failure to follow its own regulation, the doctrine of equitable estoppel was applied.

The above-cited cases cannot be distinguished on the grounds that the petitioners here are being held in custody pending an exclusion hearing and have not been admitted into the United States. In light of the peculiar circumstances surrounding their arrival and the fact that deportation to Cuba would be essentially impossible should they be found excludable, this Court need not abide by the fiction that the petitioners in this case are "waiting at the border." To hold otherwise would be flying in the face of the record of their arrival and their travels throughout the country while in confinement over a period of fourteen to sixteen months. Thus, the petitioners here can be considered admitted to the United States for purposes of applying the doctrine of estoppel against the Defendants.

Nor is the Court hard pressed to find instances of affirmative misconduct on the part of the government or injury sustained to the petitioners in light of the circumstances of their detention discussed in preceding sections of this Order. This Court need not go as far in this case as the court in *Corniel-Rodriguez*, supra, and find that the Defendants are estopped from denying the petitioners' status as resident aliens. The concern here is only with the assertion of exclusive jurisdiction by the Defendants and the conditions under which the petitioners have been held. After having delayed action for fourteen to sixteen months, the Defendants are equitably estopped from claiming exclusive jurisdiction over the custody of these five juveniles.

3) The length of detention and circumstances in which the juvenile petitioners in this case were held is a violation of their constitutional rights.

The Defendants' arguments that the power to detain an alien for the purpose of exclusion is plenary in the Executive Branch are rooted deeply in Article II of the Constitution and the statutory authority conferred by Congress in its enactment of the Immigration and Naturalization Act. Nor is this Court unaware of the need to protect the public from aliens who have committed crimes in other countries and might be dangerous to society if released in the United States. Still, the protections afforded all persons within the United States by the Constitution are paramount and cannot be denied to these petitioners by virtue of their status as aliens awaiting exclusion hearings.

■ Rights conferred by the Fifth Amendment are not limited to citizens of the United States but extend to all persons within these borders. Such was the holding of *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), in which the Supreme Court struck down a statute allowing administrative officials to arrest and imprison Chinese found illegally within the country. In applying the Fifth and Sixth Amendments, the court noted that:

(I)t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment by a

grand jury, nor be deprived of life, liberty, or property without due process of law. 163 U.S. at 238, 16 S.Ct. at 981.

Relying on *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) and the above-quoted portion of *Wong Wing*, supra, the Tenth Circuit United States Court of Appeals found in *Rodriguez-Fernandez v. Wilkinson*, supra, that "an excluded alien in physical custody within the United States may not be 'punished' without being accorded the substantive and procedural due process guarantees of the Fifth Amendment." Nor would the court in *Rodriguez-Fernandez* distinguish between an excludable alien who is regarded as "standing at the border" and one who is a resident in the United States. The Tenth Circuit went on to hold that the detention for an indefinite period pending deportation of a Cuban refugee which is not likely to take place is a deprivation of liberty in violation of the Fifth Amendment. The fact that the petitioner in that case had been found excludable while the five juveniles before this Court are still awaiting the final determination of the special inquiry officer does not compel a different result. Having asserted their rights under the Fifth Amendment, further detention of these petitioners cannot be tolerated.

CUSTODY OF THE PETITIONERS:

Petitioners have not requested, nor is the Court willing to grant, a complete severance of the jurisdiction exercised over them by the Attorney General and the INS. This Order goes only so far as to place these five juveniles in the temporary custody of willing and able sponsors until the Defendants can make an appropriate determination of their fate. The representatives of four Colorado households * have come before the Court and testified as to their desire and capability to sponsor any or all of the petitioners. From the information adduced at the hearing, all four would appear to be qualified for providing for the financial, educational, and emotional needs

of the petitioners, despite the fact that they might have to do so without state or federal assistance.

The Court is aware of the need to protect the public from the dangers involved in releasing aliens who have committed crimes in other countries into society. Yet, the evidence is strong that the conduct of the petitioners has been above reproach since their arrival in the United States, particularly in light of the conditions under which they have been held for the past fourteen to sixteen months. With the exception of Lorenzo Escobar-Sulueta, none of them has been charged with or convicted of any crime or misconduct since their arrival. Mr. Escobar-Sulueta was accused of robbery while held in custody at Ft. Indiantown Gap, Pennsylvania, but the case was dismissed.

While held at the Emerson House in Denver, Colorado all of the petitioners were released into the custody of Colorado families for weekend furloughs. During these stays, all of them demonstrated model citizenship traits and created no problems for their sponsors. Among others, Rev. Natividad Avalos of Arvada, Colorado testified that all five petitioners had stayed with him at his home at one time or another. He further testified that at various times while the boys were in his custody, he actually provided opportunities for them to escape or steal money and valuables left in conspicuous places throughout his house. At no time did the petitioners fail these tests of honesty and the Court is convinced that their superior conduct demonstrated during the time spent outside of the Emerson House is indicative of their willingness and ability to become properly assimilated into American society.

FINDS AS TO OTHER ASPECTS OF
THE PETITION NOT OTHERWISE
ADDRESSED IN THIS ORDER:

Those allegations of fact made in the Petition for Writ of Habeas Corpus not

---

* Those testifying as sponsors for the petitioners included Raymond B. McConnell of Greeley, Colorado, Mrs. Daisy Broche of Denver, Colora-

do, Rev. Natividad Avalos of Arvada, Colorado, and Vivian DeCardeness of Denver, Colorado.

specifically addressed in the preceding sections of this Order are to be considered true for purposes of this suit.

NOW, THEREFORE, IT IS HEREBY

ORDERED that custody of the petitioners be, and the same hereby is, temporarily transferred to Mr. and Mrs. Raymond B. McConnell of 1223 23rd Avenue Court in Greeley, Colorado. Custody shall remain with Mr. and Mrs. McConnell pending an investigation of the McConnells and the other sponsors testifying before the Court in this case by the United States Probation Officer. Upon completion of the Probation Officer's investigation, within ten (10) days from the date of this hearing, custody may again be transferred in light of his recommendations and other evidence then before the Court. The Defendants' Return on Order to Show Cause and Temporary Restraining Order is denied.

IT IS FURTHER

ORDERED that the United States Attorney General and the INS shall retain jurisdiction over the petitioners in order to continue their investigation and hold hearings when appropriate. Nothing in this Order shall be construed so as to change the status of the petitioners as aliens awaiting an appropriate determination concerning their admission or exclusion under 8 U.S.C. 1225(b).

IT IS FURTHER

ORDERED that the office of the United States Attorney for the District of Wyoming shall conduct an investigation to determine whether state or federal funds will be made available in Colorado upon the release of the petitioners to the custody of sponsors within that state.