ROGERS, Circuit Judge,
concurring in the judgment:
In Boumediene v. Bush, — U.S. —, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the Supreme Court held that detainees in the military prison at Guantanamo Bay (“Guantanamo”) are “entitled to the privilege of habeas corpus to challenge the legality of their detentions,” id. at 2262, and that a “habeas court must have the power to order the conditional release of an individual unlawfully detained,” id. at 2266. Today the court nevertheless appears to conclude that a habeas court lacks authority to order that a non-“enemy combatant” alien be released into the country (as distinct from be admitted under the immigration laws) when the Executive can point to no legal justification for detention and to no foreseeable path of release. I cannot join the court’s analysis because it is not faithful to Boumediene and would compromise both the Great Writ as a check on arbitrary detention and the balance of powers over exclusion and admission and release of aliens into the United States recognized by the Supreme Court to reside in the Congress, the Executive, and the habeas court. Furthermore, that conclusion is unnecessary because this court cannot yet know if detention is justified here. Due to the posture of this case, the district court has yet to hear from the Executive regarding the immigration laws, which the Executive had asserted may form an alternate basis for detention. The district court thus erred in granting release prematurely, and I therefore concur in the judgment.
I.
The Executive chose not to file returns to the petitions for writs of habeas corpus for a majority of the petitioners. After several hearings and briefing, the district court determined that the Executive neither claimed petitioners were “enemy combatants” or otherwise dangerous, nor charged them with a crime, nor pointed to other statutory grounds for detention, nor presented reliable evidence that they posed a threat to U.S. interests. In re Guantanamo Bay Detainee Litig., Misc. No. 08-442, Mem. Op. at 4, 12 (D.D.C. Oct. 9, 2008) (“2008 Mem. Op.”). The Executive also did not deny it detained the petitioners.[1] The district court understood the *386 Executive to argue instead that it had extra-statutory “wind-up” authority to repatriate petitioners[2] and that the district court in any case lacked the authority to order them released into the United States. Id. at, 4. Rejecting both of these rationales — the first in view of the years in which the Executive had unsuccessfully sought to find a country that would receive the petitioners without risk of their being-tortured,[3] id. at 8-9, the second in view of Boumediene and the need to afford an effective habeas remedy, id. at 15-16 — the district court granted the petitions, which sought release into the country. Ruling the Executive had shown no lawful basis for what had become indefinite detention, the district court concluded petitioners must be brought before the court and released. Id. at 9, 17.
However, in the district court the Executive had also pointed to a possible separate ground for detention that the district court did not resolve — namely that petitioners were excludable under the immigration statutes and could be detained pending removal proceedings. Mot. Status Hr’g Tr. at 15, 44-45 (citing 8 U.S.C. § 1182(a)(3)(B) (aliens engaging in terrorist activities inadmissible)), 52-53, 57-58 (discussing 8 U.S.C. § 1182) (Oct. 7, 2008) (“Oct.2008 Mot. Hr’g”). The Executive had also sought a stay so it could evaluate petitioners’ status under the immigration laws and present the'views of the Department of Homeland Security,[4] id. at 44-45. *387 The district court declined to stay the proceedings, noting that petitioners had already been imprisoned for seven years and delay had been “the name of the game” in the Executive’s litigation strategy. Id. at 47, 59. Instead the district court ordered the petitioners immediately released into the United States,[5] with a hearing to follow a week later at which time the position of Homeland Security could be presented, id. at 59-60. At that time, the district court intended to consider conditions for petitioners’ continued release, id. The district court also purported to restrain the Executive from taking petitioners into custody pursuant to the immigration statutes during the week prior to the hearing, id. at 48, 60.
In so proceeding, the district court erred by ordering release into the country without first ascertaining whether the immigration laws provided a valid basis for detention as the Executive alternatively suggested. See Boumediene, 128 S.Ct. at 2266. The court seems to have relied on Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and Clark v. Martinez, 543 U.S. 371, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005), for the proposition that petitioners could no longer be detained, see 2008 Mem. Op. at 8. But in those cases the Supreme Court first assessed the Executive’s arguments that it had the right to detain under the immigration statutes before finding that power had expired and ordering release. Clark, 543 U.S. at 386-87, 125 S.Ct. 716; Zadvydas, 533 U.S. at 699, 121 S.Ct. 2491. In so doing, the Court gave effect to both the province of the Great Writ as a check on unjustified detention and the power of the political branches over exclusion and admission of aliens into the country. See Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491 (noting that purported “plenary powers” of Congress to create immigration law are “subject to important constitutional limitations”); see Clark, 543 U.S. at 384, 125 S.Ct. 716. To instead order release before assessing asserted legal authority for detention is incompatible with the obligation of a habeas court. See infra, Part II. Even if the Executive’s delay in raising the immigration statutes as a basis for detention appears troubling given its opportunity to file returns to the writs, as the petitioners asserted they did not seek an immigration remedy, Oct. 2008 Mot. Hr’g Tr. at 7, the Executive cannot have waived the argument when it raised the argument in response to the district court’s rejection of its other rationales for detention.
Because the district court could not properly order release into this country when it could not yet know whether detention was justified, I concur in the judgment vacating the release order. Because the question of whether the immigration statutes provide that justification “cannot be resolved at this stage,” Maj. Op. at 1029 n. 14,1 would remand the case for that determination to be made.
II.
In reversing and remanding, the majority has written broadly, apparently concluding that a habeas court is without power to order the release into this country of Guantanamo detainees whom the Executive would prefer to detain indefinitely, where there is no legal basis for that detention, including no contention that these petitioners are “enemy combatants” or a *388 showing that they are even dangerous. Maj. Op. at 1026. Because this court does not know if detention could be authorized here, the majority need not reach that issue. More fundamentally, its analysis compromises both the Great Writ as a check on arbitrary detention, effectively suspending the writ contrary to the Suspension Clause, art. 1, § 9, cl. 2, and the balance of powers regarding exclusion and admission and release of aliens into the country recognized by the Supreme Court to reside in the Congress, the Executive, and the habeas court. Consequently, I cannot join it.
A.
The Executive urges this court to recognize an extra-statutory, perhaps constitutional, Executive power to detain in order to prevent an alien from entering the United States. See Appellants’ Br. at 21. Supreme Court precedent indicates there is no such power, and the Executive’s authority to exclude and remove aliens, and to detain them to effect that end, must come from an explicit congressional delegation, as the majority’s citations confirm, Maj. Op. at 1025-26. See, e.g., Zadvydas, 533 U.S. at 696-99, 121 S.Ct. 2491; Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (“As to the extent of the power of Congress [in regulating the entry and deportation of aliens], there is not merely ‘a page of history,’ but a whole volume.... [T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.”) (citations omitted, emphasis added); Fong Yue Ting v. U.S., 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Ekiu v. United States, 142 U.S. 651, 659-60, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) (the power to detain, remove, and exclude aliens “may be exercised either through treaties made by the president and senate, or through statutes enacted by congress”); Chae Chan Ping v. United States (Chinese Exclusion Case), 130 U.S. 581, 603, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). It would be surprising under our constitutional system if the law were otherwise. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 640, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (“I did not suppose, and I am not persuaded, that history leaves it open to question, at least in the courts, that the executive branch, like the Federal Government as a whole, possesses only delegated powers. The purpose of the Constitution was not only to grant power, but to keep it from getting out of hand.”). Even the single apparent outlier to this line of precedent, which stated that the power to exclude aliens “stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation,” U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950), is no outlier at all. In Knaujf, the Court upheld the challenged action because it was authorized by statute, albeit in “broad terms,” id. at 543, 70 S.Ct. 309, thereby acknowledging that the political branches act on matters of exclusion and admittance through statutes and treaties.
Where the Executive claims need of a power not yet delegated in order to control entry into the country, the Supreme Court has instructed it to look to Congress for a remedy. See Clark, 543 U.S. at 386, 125 S.Ct. 716 (“The Government fears that the security of our borders will be compromised if it must release into the country inadmissible aliens who cannot be removed. If that is so, Congress can attend to it.”); see also Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (“USA PATRIOT ACT”), Pub.L. 107-56, § 412(a), 115 Stat. 272, 350 (codified at 8 U.S.C. § 1226a(a)(6)) (providing Attorney General *389 authority to detain terrorist aliens pursuant to removal longer than six months under certain circumstances, after the Supreme Court in Zadvydas found no such statutory authority then existed, 533 U.S. at 691, 121 S.Ct. 2491). Other statutory justification may also exist in some cases. See Clark, 543 U.S. at 387, 125 S.Ct. 716 (O’Connor, J., concurring) (pointing out that the Executive “has other statutory means for detaining aliens whose removal is not foreseeable and whose presence poses security risks,” including authority under the USA PATRIOT ACT). If these petitioners present “special circumstances,” Zadvydas, 533 U.S. at 696, 121 5.Ct. 2491, as the Executive appears to suggest, see supra n. 3, Congress may, within constitutional limits, provide a remedy, id. at 695,121 S.Ct. 2491.
Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), relied on by the majority (and the Executive), Maj. Op. at 1027, is not to the contrary. That case does not stand for the proposition that any detention by the Executive is authorized if it selves to effect exclusion of an alien whom the Executive chooses not to admit. To the contrary, the Supreme Court looked to a statute then in effect and since repealed, wherein Congress had “expressly authorized” the President to exclude aliens without a hearing when the Attorney General determined entry would be prejudicial to the interests of the United States. 345 U.S. at 210, 73 S.Ct. 625. The Attorney General so determined and ordered the petitioner excluded on the basis of confidential information. Id. at 208, 73 S.Ct. 625. Thus, in Mezei the Supreme Court recognized broad Executive power not because it was inherent to the Office of the President, but because in Mezei’s case that power was specifically authorized by Congress. Id. at 216, 73 S.Ct. 625 (“[Rjespondent’s right to enter the United States depends on the congressional will, and courts cannot substitute them judgment for the legislative mandate.”). Mezei is thus another case in which the Supreme Court found detention justified because it was authorized by statute.
B.
The majority does not adopt outright the Executive’s argument that detention here is justified under an extra-statutory Executive power, but instead seems to conclude that the habeas court lacks the power to order the release of non-“enemy combatant” Guantanamo detainees from indefinite detention, even where such detention is not justified by statute. The effect, however, is much the same. To reach this conclusion, the majority has recast the traditional inquiry of a habeas court from whether the Executive has shown that the detention of the petitioners is lawful to whether the petitioners can show that the habeas court is “expressly authorized” to order aliens brought into the United States. Maj. Op. at 1026. Along the way, the majority’s analysis, Maj. Op. at 1028, tends to conflate the power of the Executive to classify an alien as “admitted” within the meaning of the immigration statutes, and the power of the habeas court to allow an alien physically into the country.[6] But this analysis, like *390 the majority’s rights/remedy discussion, Maj. Op. at 1027, ignores the very purpose of the Great Writ and its province as a check on arbitrary Executive power. The power to grant the writ means the power to order release.[7] Preiser v. Rodriguez, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (“[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody.”); see 3 William Blackstone, Commentaries on the Laws of England * 133 (Liberty is a “natural inherent right” which ought not “be abridged in any case without the special permission of law,” and “[t]his induces an absolute necessity of expressing upon every commitment the reason for which it is made; that the court upon an habeas corpus may examine into its validity; and according to the circumstances of the ease may discharge, admit to bail, or remand the prisoner.”); The Federalist No. 84, at 629 (Alexander Hamilton) (John C. Hamilton Ed. 1869) (describing habeas corpus as “a remedy for [the] fatal evil” of “arbitrary imprisonment”); 2 James Kent, Commentaries on American Law *32 (O.W. Holmes, Jr., ed., Little Brown, & Co. 12th ed. 1873) (“[The] excellence [of habeas corpus] consists in the easy, prompt, and efficient remedy afforded for all unlawful imprisonment .... ”).
Furthermore, the majority has mischaracterized relevant precedent. The majority offers that the district court did not have the power to order that petitioners be released into the United States because such an order would impermissibly “set aside the decision of the Executive Branch” to deny petitioners release into the United States. Maj. Op. at 1026. But the Supreme Court in Clark makes clear that a district court has exactly the power that the majority today finds lacking — the power to order an unadmitted alien released into the United States when detention would otherwise be indefinite. 543 U.S. 371, 386-87, 125 S.Ct. 716 (2005). The majority notes that Clark, like Zadvydas, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, rested on the proposition that detention was unauthorized by the immigration statutes. Maj. Op. at 1027-28. But that only goes to whether detention is justified. Relevant here is that once the Supreme Court concluded the detention was unlawful, it ordered the aliens released into the United States. If the majority were correct that a habeas court, upon finding that the Executive detains indefinitely an unadmitted alien without *391 authorization, is nonetheless powerless to order release, then the Executive in Clark could have continued the detention, even without legal justification. Instead, the Supreme Court held that “the petitions for habeas corpus should have been granted.” 543 U.S. at 386-87,125 S.Ct. 716.
The majority also offers that because petitioners are aliens outside the United States and have not applied for visas they are not entitled to the same due process as the aliens in Zadvydas and even Clark. Maj. Op. at 1026, 1028 (citing, e.g., Johnson v. Eisentrager, 339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)). However, in Boumediene, 128 S.Ct. at 2257, the Supreme Court rejected this territorial rationale as to Guantanamo, holding that detainees who were brought there involuntarily were entitled under the Constitution to seek habeas relief because “[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction [and ‘plenary control’] of the United States.” 128 S.Ct. at 2261. It held further that whether a substitute process “satisfied] due process standards” was not “the end [of the Court’s] inquiry,” because “[h]abeas corpus is a collateral process that exists, in Justice Holmes’ words, to ‘cu[t] through all forms and g[o] to the very tissue of the structure.’ ” Id. at 2270 (quoting Frank v. Mangum, 237 U.S. 309, 346, 35 S.Ct. 582, 59 L.Ed. 969 (1915) (dissenting opinion)). Furthermore, the majority does not explain how a lack of procedural due process rights in petitioners, which it asserts and uses to distinguish Clark, Maj. Op. at 1031, would go to the power of the court, which the majority finds lacking, Maj. Op. at 1028.
In sum, the majority aims to safeguard the separation of powers by ensuring that the judiciary does not encroach upon the province of the political branches. But just as the courts are limited to enumerated powers, so too is the Executive, and the habeas court exercises a core function under Article III of the Constitution when it orders the release of those held without lawful justification. Indeed habeas is not an encroachment, but “a time-tested device” that “maintain[s] the ‘delicate balance of governance’ that is itself the surest safeguard of liberty,” Boumediene, 128 S.Ct. at 2247 (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion)). The petitioners have the privilege of the writ including the right to invoke the court’s power to order release, 128 S.Ct. at 2262, 2270, and the Supreme Court’s decision in Clark shows that a habeas court has the power to order the release into the United States of unadmitted aliens whom the Executive would prefer to detain indefinitely but as to whom the Executive has exercised no lawful detention authority. The petitioners seeking release into the United States are seventeen Uighurs who come to the court as unadmitted aliens who are not “enemy combatants” or otherwise shown by the Executive, when afforded the opportunity, to be dangerous or a threat to U.S. interests, and as to whom the Executive as yet has failed to show grounds for their detention, which appears indefinite. Because the district court prematurely determined the petitioners were entitled to be released into the country prior to ascertaining whether the Executive, as asserted, would have lawful grounds to detain them under the immigration statutes, I concur with the judgment and would remand the case so that the district court could so ascertain. Unlike the majority, however, I would conclude, consistent with the province of the Great Writ and the power of the political branches, that, were the district court to ascertain thereafter that petitioners’ detention is not lawful and has become effectively indefinite, then under Clark, 543 U.S. at 386-87, 125 S.Ct. 716; see supra n. *392 6, it would have the power to order them conditionally released into the country.

. The majority opinion accepts the Executive’s assertion on brief that ‘‘petitioners are held under the least restrictive conditions possible in the Guantanamo military base.” Maj. Op. at 1024, 1029; Appellants’ Br. at 9. This means, according to the uncontested allegations of petitioners, that they are still held in a high-security prison with no contact with family, friends, or news from the outside world, aside from sporadic visits from attorneys — during which detainees are at least *386 sometimes chained to the floor — and the Red Cross. See Appellees’ Br. at 8-9.

.The Executive argues this stems from the practice in past wars to detain prisoners of war ("POWs”) beyond the end of a conflict in order to arrange repatriation, as occurred, for example, with respect to German POWs held within the continental United States during World War II. The majority does not discuss this "wind up authority,” so I note only that both the Geneva Conventions and U.S. Army policy require repatriation of POWs "without delay.” The Geneva Convention (III) Relative to the Treatment of Prisoners of War, Art. 118, ratified July 14, 1955, 6 U.S.T. 3316, T.I.A.S. No. 3364; Dept. of the Army, The Law of Land Warfare, Field Manual 27-10 at ¶ 71(d) (1957) (instituting verbatim Geneva Convention III Art. 118). In the first Gulf War, for example, all POWs — over 80,000— were repatriated or granted refugee status within Saudi Arabia within six months of the cessation of hostilities. U.S. Dep't of Def., Final Report to Congress: Conduct of the Persian Gulf War at *662, *671-72 (Apr. 1992), available at http://www.ndu.edu/ library/epubs/cpgw.pdf. By contrast, these seventeen petitioners, who have not been treated as POWs, have been imprisoned at Guantanamo for over seven years, and, as the district court determined, the Executive’s unsuccessful efforts to locate a suitable country for release had been on-going for more than five years and "[petitioners’] detention has become effectively indefinite.” 2008 Mem. Op. at 8-9.

. The majority understates the extent to which there is no other viable country to which these petitioners can go. Maj. Op. at 1024. It is not only petitioners who fear they would be tortured if returned to their homeland of China; former Navy Secretary Gordon England and former Secretary of State Colin Powell confirmed as much, and the Executive has never disputed that proposition, even in this litigation. And, while the majority states it is the "policy” of the United States not to render people into countries in which they will be subject to torture or other mistreatment, id., that is also the legal obligation of die United States as a signatory to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, signed Apr. 18, 1988, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Nothing in the Executive's filings under seal on January 16 and 28, 2009 has changed the situation.

. See Homeland Security Act of 2002, Pub.L. No. 107-296, §§ 101, 441-478, 116 Stat. 2135, 2142, 2192-2212 (codified at 6 U.S.C. §§ 111, 251-298) (establishing Department of Homeland Security and vesting in it responsibility for border security and immigration).

. Petitioners were to be released in accordance with a detailed plan, developed with Lutheran Immigration and Refugee Services, the president of the World Uighur Congress, and others for their housing with Uighur families in the area, transportation, financial support, and care. See Oct. 2008 Mot. Hr'g Tr. at 49-52, 63. They acknowledged through counsel that conditions for bringing them into the country presented issues for the Department of Homeland Security. Id. at 52.

. See Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491 (“The question before us is not one of 1 "confer[ring] on those admitted the right to remain against the national will" ’ or ' “sufferance of aliens" ’ who should be removed. Rather, the issue we address is whether aliens that the [Executive] finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.” (citation omitted)); Mezei, 345 U.S. at 212, 73 S.Ct. 625 (an inadmissible alien, although physically present in the United States, is deemed to be “only on the threshold of initial entry"); see also 8 U.S.C. § 1182(d)(5)(A); Leng May Ma v. Barber, 357 *390 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040 (1905) (Holmes, J.) ("The petitioner, although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate.”). The district court here was presented with motions for "parole” and for release.

. As petitioners have not styled their pleadings as compensatory claims, the majority's citations to Heck v. Humphrey, 512 U.S. 477, 481, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and Preiser v. Rodriguez, 411 U.S. 475, 493, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), which addressed monetary claims, are to that extent irrelevant. Maj. Op. at 1029. So too are the citations in the majority's discussion of a right/remedy dichotomy, Maj. Op. at 1027, e.g., Wilkie v. Robbins, - U.S. -, 127 S.Ct. 2588, 2597-98, 168 L.Ed.2d 389 (2007), where the question was whether a new cause of action should be created to provide a remedy for a constitutional harm under Bivens. Likewise, the citation to Munaf v. Geren, - U.S. -, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), Maj. Op. at 1028, is inapposite; unlike the petitioners in Munaf, petitioners here are not seeking to circumvent the local law and in fact disavowed any intention to change their status under the immigration laws through habeas. Oct. 2008 Mot. Hr'g Tr. at 7.